IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

GARRY THOMAS ALLEN,                )
                                   )
          Petitioner,              )
                                   )
vs.                                )     Case No. CIV-12-140-R
                                   )
RANDALL G. WORKMAN, Warden,        )
     Oklahoma State Penitentiary,  )
                                   )
          Respondent.              )

MEMORANDUM OPINION AND ORDER

In Ford v. Wainwright, 477 U.S. 399 (1986), the Supreme Court held that "[t]he

Eighth Amendment prohibits the State from inflicting the penalty of death upon a prisoner

who is insane." Id. at 410.  A prisoner's sanity to be executed must be judged as to his

present mental state when execution is imminent. Stewart v. Martinez-Villareal, 523 U.S.

637, 644-45 (1998).

> Under Ford, once a prisoner makes the *requisite preliminary showing* that his
> current mental state would bar his execution, the Eighth Amendment,
> applicable to the States under the Due Process Clause of the Fourteenth
> Amendment, entitles him to an adjudication to determine his condition.  These
> determinations are governed by the substantive federal baseline for
> competency set down in Ford.

Panetti v. Quarterman, 551 U.S. 930, 934-35 (2007)(emphasis added).  Thus, a prisoner must

first make the necessary preliminary showing of his incompetency to be executed before he

is entitled to an adjudication to determine his condition.

<u>Ground 1:</u>      <u>Constitutionality of Oklahoma's Competency to be Executed Statute.</u>[1]

Petitioner claims Oklahoma's competency to be executed procedure does not comply with the Eighth and Fourteenth Amendments' bar against the execution of an incompetent person as identified in <u>Ford</u>.  Oklahoma's procedure for determining whether a person is competent to be executed is set out in statute:

> If, after his delivery to the warden for execution, there is good reason to believe that a defendant under judgment of death has become insane, the warden must call such fact to the attention of the district attorney of the county in which the prison is situated, whose duty is to immediately file in the district or superior court of such county a petition stating the conviction and judgment and the fact that the defendant is believed to be insane and asking that the question of his sanity be inquired into. Thereupon, the court must at once cause to be summoned and impaneled from the regular jury list a jury of twelve persons to hear such inquiry.

Okla. Stat. tit. 22, § 1005.

In <u>Ford</u>, Ford's counsel invoked the procedures of Florida law governing the determination of the competency of a condemned inmate.[2]  Following those procedures, the Governor appointed a panel of three experts to evaluate whether Ford had "'the mental

---

[1]  For the purposes of this Opinion, the terms "competency" and "sanity" will be used interchangeably by the Court.

[2]  For over fourteen (14) months, a psychiatrist retained by his attorney examined Ford and recommended appropriate treatment.  The doctor concluded that Ford suffered from a severe mental disease which closely resembled paranoid schizophrenia with suicide potential.  Ford believed, among other things, that prison officials had taken his family members hostage, that he had won a landmark case preventing all executions, and that he was free to leave the prison any time he chose. After he refused to see the psychiatrist, believing the doctor had joined the conspiracy against him, another doctor was retained by counsel.  He concluded that Ford had no understanding of why he was being executed and made no connection between the homicide and his penalty of death.  Ford regressed further to nearly complete incomprehensibility to the point of speaking only in a code characterized by the intermittent use of the word "one." <u>Id.</u> at 402-03.

capacity to understand the nature of the death penalty and the reasons why it was imposed upon him.'" Ford at 403-04 (statutory citation omitted). The experts interviewed Ford together at a single thirty (30) minute meeting and then each filed individual reports with the Governor. The reports had three different diagnoses, but all agreed that Ford was competent or sane as defined by state law. Absent any further opportunity for Ford's counsel to present additional evidence or argument, the Governor signed the death warrant for execution without explanation or statement. Id. at 404.[3]

On certiorari review to determine the issue of whether the Eight Amendment prohibited the execution of the insane and whether the district court should have had a hearing on the petitioner's claim of competency, the Supreme Court found that the most striking defect in Florida's statutory procedures was the State's placement of the decision of competency in the executive branch, and more specifically, in the hands of the Governor, whose subordinates were responsible for every stage of the prosecution, and who appointed the experts and made the final determination whether the State would be able to carry out the execution. Id. at 416.

Petitioner claims Oklahoma's statutory procedure unconstitutionally places his fate entirely with the Warden and, further, does not provide for recourse from the Warden's decision. He asserts the Warden is no different than the Governor in Ford – that he is an

---

[3] Ford's attorneys thereafter unsuccessfully sought a hearing in state court to determine his competency, and then filed a petition for habeas corpus in District Court seeking, among other things, an evidentiary hearing. The petition was denied. On appeal, the Court of Appeals addressed the merits of the appeal and a divided panel affirmed the denial of the writ.

executive officer, a party to the habeas lawsuit, and the person charged with carrying out his execution.  He contends the Warden's "gatekeeping" function of whether there is "good reason to believe" an inmate under sentence of death has become insane is equivalent to the Governor's ultimate decision power criticized in <u>Ford</u>.

Respondent responds that the previous 2008 jury trial regarding Petitioner's sanity satisfies the requirements of <u>Ford</u>, and that when the Warden rejected Petitioner's 2012 claim of insanity, the subsequent procedures to obtain judicial review of the Warden's decision not to invoke the § 1005 proceedings rendered Petitioner's present claim moot.  Alternatively, Respondent argues that even if not moot, Petitioner has not shown that Oklahoma's procedure is unconstitutional.

A recapitulation of the procedural history of Petitioner's claim of incompetency to be executed places it in a more illustrative light.  Petitioner's original execution date was May 19, 2005.  This date was set by the Oklahoma Court of Criminal Appeals ("OCCA") after certiorari was denied by the Supreme Court in February of that year and after the Oklahoma Pardon and Parole Board recommended clemency on April 20, 2005.  On May 12, 2005, a psychological report and affidavit was prepared by Jack Randall Price, Ph.D. regarding his evaluation of Petitioner on May 11, 2005.  On May 18, 2005, one day before Petitioner's scheduled execution, the District Attorney of Pittsburg County filed a Petition raising the issue of Petitioner's sanity to be executed.  The trial court judge entered a stay of execution that same day pending the resolution of the issue of Petitioner's competency to be executed.

After several pre-trial procedural hurdles[4], a jury trial on Petitioner's sanity to be executed was held April 28 - May 1, 2008.  The jury returned a verdict finding Petitioner sane.  On September 28, 2009, Petitioner's motion for a new trial was denied by the trial court.  Petitioner's Notice of Intent to Appeal the Pittsburg County jury verdict was filed on October 7, 2009.  The appeal was dismissed by the OCCA on December 8, 2011.  Allen v. State, 265 P.3d 754 (Okla. Crim. App. 2011).[5]  The OCCA found that Oklahoma's procedure was constitutional.  Id. at 756.  It also determined that the appeal was unauthorized and had to be dismissed in light of the finding that "there is no federally mandated right to a state appeal and no Oklahoma state constitutional mandate or Oklahoma statute requiring an appeal from the finding that person facing execution is sane."  Id. at 757.[6]  Thereafter, on January 12, 2012, the OCCA set Petitioner's execution date for February 16, 2012.

At the request of Petitioner's counsel, Dr. Michael Gelbort met with Petitioner on February 3, 2012, and prepared a report of his findings on February 4, 2012.  The overall substance of Dr. Gelbort's opinion and report was that Petitioner was not legally competent (sane) to be executed.  On February 6, 2012, Petitioner filed a Renewed Petition for Writ of

---

[4] For instance, on October 12, 2005, the OCCA denied Petitioner's interlocutory appeal to prevent the State from using an independent mental health expert at trial.  Allen v. State, PR-2005-813, slip op. (Oct. 12, 2005).

[5] Originally, on November 23, 2009, the Oklahoma Supreme Court determined it had jurisdiction over the matter.  That Court reversed itself on December 15, 2010, and transferred the case to the OCCA.

[6] The OCCA relied upon Okla. Stat. tit. 22, §§ 1007 and 1008, and Halbert v. Michigan, 545 U.S. 605, 610 (2005).

Habeas Corpus in this Court – the instant case.  Three days later, on February 9, 2012, Oklahoma Governor Mary Fallin granted a thirty (30) day stay of execution to review Petitioner's request for clemency.  Governor Fallin denied the clemency request and subsequently granted an additional thirty (30) day stay and set a new date of April 12, 2012 for Petitioner's execution.

Prior to the second thirty-day stay, but after the filing of Petitioner's renewed petition in this Court, counsel for Petitioner provided to the Warden of the Oklahoma State Penitentiary for the first time a copy of the report prepared by Dr. Gelbort (by facsimile dated February 21, 2012).  In a status conference held in this Court on March 14, 2012, the Court was informed by Respondent's counsel that even after review of Dr. Gelbort's report, the Warden did not find there was good reason to believe that Petitioner had become "insane" as required by Oklahoma statute.

On March 23, 2012, after approval by this Court for Petitioner's appointed federal public defender to represent him in state court, Petitioner filed in Pittsburg County, Oklahoma, his Petition for Writ of Mandamus and a request for a stay of his execution.  On March 27, 2012, this Court entered an Order holding the instant case in abeyance pending the resolution of the state court proceedings.  On April 2, 2012, an evidentiary hearing was held in Pittsburg County, Oklahoma.  The state court judge ruled that Warden Workman had not abused his discretion in refusing to initiate proceedings under Okla. Stat. tit. 22,  O.S. § 1005, denied Petitioner's request for a writ of mandamus and denied a stay of execution.  On April 5, 2012, Petitioner filed with the OCCA his Petition for Writ of Mandamus and an

Application for Stay of Execution.  On April 10, 2012, the OCCA granted Petitioner's Application to Amend Pleadings, and denied his Petition for Writ of Mandamus and Application for Stay of Execution. Allen v Workman, MA-2012-307, slip. op. (April 10, 2012).  The following day, April 11, 2012, this Court issued an Order resuming proceedings, granting a stay of execution and setting a briefing schedule.  The Order was amended by the Court on April 12, 2012.  The stay of execution was affirmed by the Tenth Circuit in an en banc Order and Judgment dated April 19, 2012.

As stated above, Petitioner claims Oklahoma's statute is unconstitutional and contrary to Ford, as the statute makes the Warden – an official in the executive branch of government as was the Governor in Ford – the "gatekeeper" to Petitioner's claim of insanity.  It is important to remain mindful, however, whether or not he agrees with the outcome, that Petitioner has been afforded a prior sanity trial in which a jury determined him to be sane as required for his execution.  There does not appear to be any dispute by the parties that the previous sanity trial comported with the standards of Ford and with due process.  What is at issue here, at least as succinctly put as the Court is able based on the "substantially inter-related" nature and presentation of the various claims, is that: (1) time has passed since the sanity trial; (2) that the sanity trial only determined Petitioner was sane at that point in time; (3) that now that his execution is again imminent and Petitioner is armed with a newer opinion declaring him insane, the Warden should find from that report – ignoring anything to the contrary – that "good reason" exists to believe Petitioner has become insane; and, (4) that that the Warden must initiate the statutory proceedings for a judicial determination of

sanity to be executed.

Under <u>Ford</u>, the State "may properly presume that petitioner remains sane at the time sentence is to be carried out, and may require a *substantial threshold showing of insanity* merely to trigger the hearing process. *Cf.* <u>Ake v. Oklahoma</u>, 470 U.S. 68, 82-83, 105 S. Ct. 1087, 1096, 84 L.Ed.2d 53 (1985)." <u>Ford</u> at 426 (POWELL, J., concurring in part and concurring in the judgment)(footnote omitted)(emphasis added).   Apart from the State's allowed presumption of sanity, other reasons exist sufficient to recognize the necessity of a high threshold preliminary showing of sanity: "It may be that some high threshold showing on behalf of the prisoner will be found a necessary means to control the number of nonmeritorious or repetitive claims of insanity. *Cf.* <u>Pate v. Robinson</u>, 383 U.S. 375, 387, 86 S. Ct. 836, 843, 15 L.Ed.2d 815 (1966)(hearing on competency to stand trial required if "sufficient doubt" of competency exists)." <u>Id.</u> at 416-17 (footnote omitted).

Petitioner has not shown that Oklahoma's statute regarding sanity to be executed is on its face unconstitutional.  As discussed above, <u>Ford</u> also involved a preliminary showing of insanity before the Florida sanity determination procedures were initiated and applied. Contrary to Petitioner's assertions, Oklahoma's threshold showing of insanity by the Warden differs from the sanity determination procedure in <u>Ford</u> found to be unconstitutional by the Supreme Court.  The Warden is not making the sanity determination.  Instead, the Warden must believe there is good reason that Petitioner is insane, at which time a sanity jury trial is initiated and evidence and testimony is allowed to be presented to a jury of twelve persons. Unlike <u>Ford</u>, the jury is the decision maker in Oklahoma.

8

The Supreme Court in both <u>Ford</u> and <u>Panetti</u> recognized that the states may require a threshold determination merely to trigger a hearing process, and that such threshold showing might necessarily be high in order to winnow out and control the number of repetitive and non-meritorious claims.   Petitioner has not shown Oklahoma's procedure utilizing the Warden in the threshold determination is unconstitutional or contrary to Supreme Court precedent.  Nor has Petitioner demonstrated the statute as applied to him is unconstitutional.  In 2005, the Warden initiated a sanity jury trial in accordance with the statute.  A jury determined Petitioner was competent/ sane to be executed.  In 2012, although the Warden did not find good reason to believe that Petitioner had become insane, Petitioner was still able to receive judicial review of the Warden's decision by both the state district court and the OCCA.   Petitioner has not demonstrated Oklahoma's procedure for enforcement of the constitutional restriction against the execution of the insane upon Petitioner's sentence was violative of <u>Ford</u>.

Under the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"),  in order to obtain federal habeas relief once a State court has adjudicated a particular claim on the merits, Petitioner must demonstrate that the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1-2).

The Supreme Court defined "contrary to" as a State court decision that is

"substantially different from the relevant precedent of this Court." Williams v. Taylor, 529
U.S. 362, 405 (2000) (O'Connor, J., concurring and delivering the opinion of the Court).  A
decision can be "contrary to" Supreme Court precedent "if the state court applies a rule that
contradicts the governing law set forth in [Supreme Court] cases" or "if the state court
confronts a set of facts that are materially indistinguishable from a decision of this Court and
nevertheless arrives at a result different from [Supreme Court] precedent." Id. at 405.  The
"unreasonable application" prong comes into play when "the state court identifies the correct
governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of
the particular state prisoner's case" or "unreasonably extends a legal principle from [Supreme
Court] precedent to a new context where it should not apply or unreasonably refuses to
extend that principle to a new context where it should apply." Id. at 407.

     The "AEDPA's purpose [is] to further the principles of comity, finality and
federalism.  There is no doubt Congress intended AEDPA to advance these doctrines."
Williams v. Taylor, 529 U.S. 420, 436 (2000).  "The question under AEDPA is not whether
a federal court believes the state court's determination was incorrect but whether that
determination was unreasonable – a substantially higher threshold." Schriro v. Landrigan,
550 U.S. 465, 473 (2007).  The deference embodied in Section 2254(d) "reflects the view
that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice
systems,' not a substitute for ordinary error correction through appeal." Harrison v. Richter,
___ U.S. ___, 131 S. Ct. 770, 786 (2011)(citation omitted).  Petitioner has failed to
demonstrate that any determination by the state court on any of the issues raised here was

contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.  The State court relied on Supreme Court law when it determined Oklahoma's statute was constitutional, and for the reasons expressed above, nothing presented to this Court demonstrates such application to be contrary to or an unreasonable application of federal law.  Accordingly, Petitioner's first ground for relief is denied.

Ground 2:      Jury Bias.

      Petitioner argues that his competency jury trial was biased because the jurors were not concerned with his legal competency to be executed as much as they were concerned with the fiscal impact of his treatment on their community should he be adjudicated incompetent.[7] He also alleges the jurors were concerned with vindicating the victims through his execution, and that they also did not accept the premise of the proceedings that execution of incompetent persons is prohibited.  In support of his allegations, Petitioner relies on excerpts of comments made by a juror during voir dire and relies on post-trial affidavits of two of the jurors that were included with Petitioner's motion for a new trial.

      Respondent responds that the trial court did not abuse its discretion in denying Petitioner's challenge to the venireman, and that the trial court correctly rejected the affidavits of the two jurors under state evidentiary law as they improperly pertained to the

---

[7] Petitioner states that he believes his prior state competency proceeding is a nullity in terms of the real issues, but presents this claim in the alternative should the Court disagree.  Although the Court realizes the paramount issue involves Petitioner's sanity to be executed now that execution is imminent, it does not agree the prior competency trial is a nullity.  At the minimum, it is at least a prior benchmark for which considerations can and should be used in the analysis of Petitioner's claims.

jurors' deliberative processes.  Respondent adds that the state court's determination was neither contrary to, nor an unreasonable application of, clearly established federal law.

Although Petitioner is not entitled to an appeal from his competency proceeding in State court[8], he did raise his claims of juror bias with the district court in a motion for a new trial which was rejected on the merits. (O.R. II, 352-56; 9/28/2009 Mot. Hearing Tr. 61-76). Regarding his claims supported by the juror's post-trial affidavits, the trial court ruled the affidavits and information contained therein was inadmissible under Oklahoma law to impeach the verdict, relying on Okla. Stat. tit. 12, § 2606(B).  Accordingly, this Court is required to give deference to the State court's determination under 28 U.S.C. § 2254(d). See Richie v. Workman, 599 F.3d 1131, 1141-42 (10th Cir. 2010).

In Matthews v. Workman, 577 F.3d 1175 (10th Cir. 2009), the Tenth Circuit considered a claim virtually identical to the one presented here – that the exclusion of evidence of a juror's statement regarding the deliberation process was improper.  The Tenth Circuit stated that "[t]here is nothing in clearly established Supreme Court law requiring states to take cognizance of evidence excludable under such common evidentiary rules." Id. at 1182 (citing Tanner v. United States, 483 U.S. 107, 113-16 (1987)).

Applying the required deferential standard, the ruling of the state trial court was not unreasonable.  The state evidentiary rule is virtually identical to Federal Rule of Evidence 606(b).  Neither rule allows a juror to testify about "any statement made or incident that

---

[8] Bingham v. State, 169 P.2d 311, 314 (Okla. Crim. App. 1946).

occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." Fed. R. Evid. 606(b).  The affidavits and testimony sought to be introduced involved allegations of other jurors' beliefs regarding sanity and execution, the impact of those beliefs on the deliberations and ultimate outcome of the trial, the impact of a finding of insanity on prison employees, and a consideration of an insanity determination as a "waste of money".  These allegations are the exact type of prohibited testimony excluded by the evidentiary rules. Accordingly, the determination by the trial court to exclude such evidence was not unreasonable.

Nor was the trial court unreasonable for failing to excuse venireperson Powell for cause.  Petitioner refers to a portion of voir dire where Ms. Powell expressed either a belief or confusion regarding sanity to be executed if the person was not insane at the time of the crime.  Petitioner states that after Ms. Powell's statement and a brief recess, the trial court instructed that the law of the State and the country was that a person may not be executed if they are insane.  The trial court then asked if the jury pool would follow the law, to which the record indicated a positive response. (Amend. Pet. at 36-37.)  Petitioner then asserts that generic follow-the-law questions are insufficient to root out juror bias, citing to Morgan v. Illinois, 504 U.S. 719, 734-35 (1992), and claims that the trial court's approach was "plainly inadequate."  Respondent points out, however, that subsequent to the trial court's question, counsel returned to the issue with Ms. Powell, and she stated she could listen to the evidence and make an impartial judgment.  She further agreed with venireperson Williams that she

13

could be open-minded and listen. (Resp. at 32-36.)

When a party seeks to exclude a juror for cause, they must demonstrate, through questioning, that the potential juror lacks impartiality. Patton v. Yount, 467 U.S. 1025, 1036 (1984)(where a criminal defendant sought to excuse a juror for cause and the trial judge refused, the question is did the juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed).  The trial court must determine whether the venireman could follow the court's instructions and obey his oath. United States v. Chanthadara, 230 F.3d 1237, 1270 (10th Cir. 2000).  Such determination and evaluation of bias is a factual finding entitled to substantial deference by reviewing courts. Moore v. Gibson, 195 F.3d 1152, 1168 (10th Cir. 1999)(citations omitted).[9]  Petitioner has not overcome this required deference, and has failed to demonstrate the state district court's determination was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.

Ground 3:     Competency to be Executed.

In his last ground for relief, Petitioner asserts that he is currently incompetent, and that his execution while incompetent would violate his Eighth and Fourteenth Amendment rights. Petitioner contests both his 2008 verdict of sanity to be executed and the OCCA's 2012

---

[9]  "In making such a determination, the trial judge must assess the credibility of the prospective juror, a task an appellate court cannot easily do based upon a record. See Witt, 469 U.S. at 429, 105 S.Ct. 844; see also Castro v. Ward, 138 F.3d 810, 824 (10th Cir.) ('Because issues of credibility and demeanor are crucial to the trial judge's determination, our review of that determination is quite deferential.'), cert. denied, 525 U.S. 971, 119 S.Ct. 422, 142 L.Ed.2d 343 (1998)." Id.

affirmation of the trial court's denial of mandamus relief.[10]   Additionally, Petitioner requests this Court make a de novo review based on prior evidence and on additional evidence not previously presented to the state court.

Respondent responds that the 2008 sanity trial (including the 2009 post-trial rulings by the state trial court) and the 2012 affirmation by the OCCA of the trial court's denial of mandamus relief are all governed by the deferential review of 28 U.S.C. § 2254(d). Respondent asserts that Petitioner has not demonstrated the state court determinations are contrary to, or an unreasonable application of, clearly established federal law.

### 2008 Jury Trial

Petitioner identifies and proffers evidence and testimony presented to the jury which he claims was sufficient to establish his legal insanity at the time of trial.   At trial, Petitioner presented evidence and testimony from several experts and lay witnesses stating he was not aware that his execution was imminent and that he had an impairment of memory for information presented to him, including a repeated failure to remember his attorneys' names. One of the experts reported Petitioner had no memory of the offense and the surrounding events, and further, that he presently suffered from dementia.   Other testimony presented centered on Petitioner's seizures and the opinion that whatever peaks of functioning he achieved, he would nevertheless be incompetent as a result of seizure activity at and around

---

[10]   The request for mandamus sought a determination that Petitioner had shown sufficient evidence for a threshold showing of insanity to cause the Warden to have good reason to initiate a new sanity hearing under Okla. Stat. tit. 22, § 1005.

the time of an execution.   Overall, Petitioner contends, evidence of incompetence was profound and that he was demonstrated to be incompetent under both the federal and state standards regarding sanity to be executed. (Amend. Pet at 43-52.)

In response to Petitioner's evidence, the State presented eight employees of the Oklahoma Department of Corrections, including the Warden and a medical doctor.   The correctional officers testified as to their interactions with Petitioner immediately prior to his 2005 execution date.   The prison's medical doctor testified regarding the medication Petitioner had been given to control his seizures.   The Warden testified regarding his personal observations and his opinion that Petitioner was not insane.   The State also presented the testimony of a neuropsychologist who had conducted the most recent evaluation of Petitioner.   After two days of testing and clinical interviews, the doctor concluded Petitioner was sane under both federal and state standards regarding sanity to be executed. (Resp. at 41-45.)

In   a   federal   habeas   proceeding,   the   appropriate   inquiry   into   a sufficiency-of-the-evidence claim is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).   In the present case, however, contrary to a criminal trial, Petitioner carried the burden of proof at the state trial regarding his insanity precluding his execution.   This is not unlike the burden on an accused when raising a claim of mental retardation under Atkins v. Virginia, 536 U.S. 304 (2002).   In such cases, the appropriate review of a sufficiency of the evidence claim is

a tailored <u>Jackson</u> standard of whether, "[v]iewing the evidence in the light most favorable to the prevailing party (the State), any rational trier of fact could have found [Petitioner] not [sane] by a preponderance of the evidence." <u>Hooks v. Workman</u>, 689 F.3d 1148, 1166 (10th Cir. 2012).[11]

The Court is cognizant that conflicting evidence was presented to the jury by both parties in support of their positions.  It is not, however, this Court's province on habeas review to consider such evidence de novo.  The <u>Jackson</u> standard for sufficiency of the evidence mandates that sharply limited deference must be given to the trier of fact:

> This standard reflects the "longstanding principle that it is the jury's province to weigh the evidence and to draw reasonable inferences from testimony presented at trial." <u>Turrentine v. Mullin</u>, 390 F.3d 1181, 1197 (10th Cir.2004). Our review under this standard is "'sharply limited' and a court 'faced with a record of historical facts that supports conflicting inferences must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" <u>Messer v. Roberts</u>, 74 F.3d 1009, 1013 (10th Cir.1996) (<u>quoting</u> <u>Wright v. West</u>, 505 U.S. 277, 296-97, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992)).

<u>Hamilton v. Mullin</u>, 436 F.3d 1181, 1194 (10th Cir. 2006).

Here, as it pertains to the 2008 jury trial, after thorough review of the record and the arguments of the parties, and considered in the light most favorable to the prevailing party, the Court finds that the evidence presented at the 2008 trial was more than sufficient for a rational trier of fact to have found that Petitioner failed to provide sufficient evidence to

---

[11] "Put a different way, if any rational trier of fact could have found that [Petitioner] failed to establish, by a preponderance of the evidence, that he is [insane], then the jury verdict may be upheld." <u>Id.</u>

show he was legally insane and therefore prohibited from being executed.

## Petitioner's Current Condition

On December 8, 2011, the OCCA dismissed Petitioner's appeal from his 2008 competency trial and the 2009 denial of his motions for a new trial. His stay of execution, previously entered by the Pittsburg County District Court, was lifted on December 28, 2011, and on January 12, 2012, the OCCA set a new date for Petitioner's execution to be carried out on February 16, 2012. On February 3, 2012, Dr. Michael Gelbort met with Petitioner for testing and evaluation. The following day, Dr. Gelbort prepared his report containing his findings and opinions. On February 6, 2012, Petitioner filed his "Preliminary Renewed" Petition with this Court.

Dr. Gelbort's report stated that Petitioner continued to demonstrate cognitive limitations previously found in prior evaluations. He added that Petitioner showed greater and more consistent impairments, and that his previous diagnosis of Cognitive Disorder, NOS would now be diagnosed as Dementia NOS arising out of an open or penetrating brain injury and seizure disorder. As to the Ford standard, Dr. Gelbort reported that Petitioner did not demonstrate a normal appreciation or understanding of when his execution was scheduled, and had not engaged in any mental preparation which typically occurred in the face of a pending execution. It was Dr. Gelbort's opinion, based on the current and past data, together with his training, that to a reasonable degree of neuropsychological certainty, Petitioner "is not competent to be executed at this time." (Dkt. No. 55, Attachment 14.)

After two grants of stays of execution by the Oklahoma Governor, but without a grant

of clemency, the parties appeared for a status conference with this Court.  Pursuant to this

Court's direction, Petitioner's counsel was granted leave to file for a Writ of Mandamus in

the state district court.  The state court petition was filed on March 23, 2012, and an

evidentiary hearing was held by the Pittsburg County District Court on April 2, 2012.

At the hearing, Petitioner telephonically presented Dr. Gelbort.  Dr. Gelbort's

testimony was consistent with his February report.  In response to the trial court's question

of whether or not there was sufficient evidence for the Warden to suggest to the District

Attorney that Petitioner was insane, Dr. Gelbort responded:

> I - - I think he at times, especially after a seizure or when he's in those
> interictal periods, he would clearly and convincingly, for anyone who sat down
> and really worked with him and talked with him at that point, qualify as being
> insane.
> There are other times when he is a bit more lucid and can hold it
> together a little bit more or perhaps his nutrition is better or his medical
> condition is a little more better.
> And at those points in time, those specific points in time, and it's hard
> to predict when they are, he probably does clear the bar and would be - - even
> to be sane.  Not terribly, but still be - - you know, *I would find him to be sane*
> *at those moments.*

Mandamus Proceedings, April 2, 2012, p. 59 (emphasis added).

The Warden testified that he did not find good reason to believe that Petitioner was

insane for purposes of Okla. Stat. tit. 22, § 1005.  He testified his conclusion was based on

a competent team of mental health providers that evaluate offenders constantly within the

facility.  Those providers were dealing with Petitioner.  In addition, he had personally met

with Petitioner and evaluated the reports from the staff that worked with him. Id. at 67, 100.

Those reports included, among other things, instances of discussions by Petitioner of perhaps

meeting with the victim's family, conversations with the chaplain, conversations about sports, politics and spirituality with staff, and conversations expressing an understanding by Petitioner that he will be executed and that he had no concerns or questions about the process. Id. at 69-72.  The Warden testified there was nothing in the reports that would cause him to believe there was a real issue as to Petitioner's sanity for execution. Id. at 73, 76.  He added that he had no intention of executing Petitioner while he was having a seizure or in a postictal state of confusion.  He has made arrangements for an assigned treating physician to be present at the execution to provide medical treatment and determine if there is any postictal issues should Petitioner have a seizure.  The treating physician will have the responsibility of advising the Warden at any point "that [Petitioner] becomes cognitive if he goes into postictal state." Id. at 76-78, 88.

After hearing the testimony and reviewing the pleadings and exhibits, the trial judge denied the writ, stating that he did not believe the Warden was abusing his discretion to compel an invocation of Okla. Stat. tit. 22, § 1005 and that he had not refused to perform his legal duty. Id. at 137.[12]   From the trial court's order, Petitioner sought for a Writ of Mandamus to issue from the OCCA.  After summarizing the procedural history and Petitioner's claims, the OCCA held:

> The Supreme Court in Ford v. Wainwright, recognized that some high threshold showing on behalf of the prisoner may be necessary to control the number of repetitive claims of insanity. Id. 477 U.S. at 417, 106 S.Ct. at 2605.

---

[12]   The trial judge added: "Should Mr. Allen suffer a seizure on the date of his execution, I think the warden will halt it.  If he does not, I will.  I can guarantee you that." Id. at 137.

While we do not set a standard for an initial finding of sanity to be executed in cases heretofore at issue, we find that Allen, in this case, has not shown with the record presented to this Court that there is a reasonable probability that his condition has deteriorated to a level of insanity from the time the jury determined that he was sane under the <u>Bingham</u> standard.

The report by Dr. Gelbort references earlier reports, where he concluded that Allen was insane under the <u>Bingham</u> standard.  Dr. Gelbort's present report states that Allen's condition is consistent with earlier evaluations, and further states his earlier diagnosis of Cognitive Disorder has now morphed into Dementia arising out of his brain injury and seizure disorder.  Dr. Gelbort again concludes that Allen is insane.

Although Allen's functioning may have declined, Dr. Gelbort's latest report, alone, is not enough to convince this Court that Allen has met the substantial threshold showing that his condition has substantially deteriorated from the time a jury found him sane until the present date. <u>See</u> <u>Panetti v. Quarterman</u>, 551 U.S. 930, 949, 127 S.Ct. 2482, 2856, 168 L.Ed.2d 662 (2002).  Moreover, at the District Court hearing on this mandamus action, Dr. Gelbort's findings were contradicted by Workman's findings that Allen's mental state was sufficient to meet the <u>Bingham</u> standard, based on the daily interaction between prison employees and Allen.  The entirety of the evidence, which was considered by Workman and reviewed by the District Court, is not sufficient to meet Allen's burden.

<u>Allen v. Workman</u>, MA-2012-307, slip. op at 3-4 (Okla. Crim. App. April 10, 2012).

Based on the foregoing, the Court finds that Petitioner has failed to demonstrate the state court's determination was contrary to, or an unreasonable application of, clearly established federal law, or was an unreasonable determination of the facts in light of the evidence presented.  As recognized by the Supreme Court, states are entitled to some high threshold showing on behalf of the prisoner to control the number of repetitive claims of insanity.  Petitioner has not demonstrated that either the threshold showing was met, or that the state court's determination of that fact was unreasonable.   Nor has Petitioner

demonstrated that either the jury's determination of sanity or the state trial court's denial of his motions for new trial were unreasonable or contrary to clearly established federal law. Petitioner's third ground for relief is denied in its entirety.

After a complete review of the transcripts, sanity trial and evidentiary hearing records, appellate record, briefs filed by Petitioner and Respondent, and the applicable law, the Court finds Petitioner's request for relief in his *Amended Petition For a Writ of Habeas Corpus* (Dkt. No. 55) should be denied. ACCORDINGLY, habeas relief is DENIED on all grounds. An appropriate judgment will be entered.

IT IS SO ORDERED this 26th day of September, 2012.

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE